UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Hamid Amini, | Civil No. 09-435 (DWF/AJB) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| City of Minneapolis, a municipality, | |
| Defendant. | |

_____

Stephen C. Fiebiger, Esq., Stephen C. Fiebiger & Associates, Chartered, counsel for Plaintiff.

Sara J. Lathrop, Assistant City Attorney, Minneapolis City Attorney's Office, counsel for Defendant.

_____

# INTRODUCTION

This matter is before the Court pursuant to a Motion for Summary Judgment brought by Defendant City of Minneapolis (the "City"). For the reasons stated below, the City's Motion for Summary Judgment is granted.

# BACKGROUND

Plaintiff Hamid Amini ("Amini") brought this action against the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII") and 42 U.S.C. § 1981. Amini alleges that the City discriminated against him because of his national

origin, race, and color by failing to hire him for a position in the Minneapolis Police Department ("MPD").[1]

Amini was born in Kabul, Afghanistan, moved to India in 1989, and then moved to the United States in 1991. (Aff. of Stephen C. Fiebiger ("Fiebiger Aff.") ¶ 2, Ex. HH (Dep. of Hamid Amini ("Amini Dep.")) at 9-10.) Amini attended the University of Minnesota and graduated in 1997 with a B.A. in political science and a minor in French. (*Id.*) Amini earned a certificate in law enforcement from Metropolitan State University in 2000. (*Id.*) Amini took and passed the licensing examination and obtained his police officer standards training (P.O.S.T.) certificate, which was renewed and valid until April 2007. At some point, Amini became a United States citizen. Amini applied for the position of police officer recruit with the MPD six or seven times. (Amini Dep. at 37.) He first applied in 1996. (*Id.*)

The hiring process for the MPD includes oral and written examinations, a fitness test, a psychological examination, and a background investigation. (Fiebiger Aff. ¶ 2, Ex. GG (Dep. of Scott Gerlicher ("Gerlicher Dep.")) at 10-11.) The MPD posts vacancies for

---

[1] In his Complaint, Amini alleged that the City failed to hire him "because of his national origin, Afghan, and color." (Compl. ¶ 1.) The City claims that Amini's allegations do not include discrimination based on race. In his opposition papers, Amini suggests that this case addresses alleged discrimination based on "national origin, Afghan, race and color" but also asserts that his § 1981 claim is based on "national origin, Afghan, and color." (Pl.'s Mem. of Law in Opp. to Summ. J. at 1, 55.) The Court liberally reads Amini's Complaint as stating a claim for race discrimination, but notes that this reading does not affect the outcome of the case in that the Court's ultimate decision would be the same even if the case only contained allegations of national origin discrimination.

police officer positions on the City's website. (Aff. of William Champa ("Champa Aff.") ¶ 2.) Persons wishing to apply for the postings are required to complete the City's application. (*Id*.) Candidates have the opportunity, but are not required, to complete a Voluntary Confidential Information form on which they can identify their race, gender, or other demographic information. (Champa Aff. ¶ 3, Ex. 4.) The City claims that this form is used to track and improve the effectiveness of the City's Diversity and Government Compliance reporting efforts and is not shared with hiring decision-makers. (Champa Aff. ¶¶ 3, 4.)

Once completed, the Human Resources Department reviews and scores each application. (Champa Aff. ¶ 5.) Candidates are given 70 points if they meet minimum qualifications and are awarded additional points based on criteria such as a candidate's previous employment. (*Id*. ¶ 6.) This score determines which candidates will make it through to the next stage and invited for fitness testing. (*Id*.) If a candidate passes the fitness test, he or she is then invited to an "oral examination." (*Id*. ¶ 8.) The fitness and oral examination scores are weighted and added together. (*Id*.) Veteran's Preference points are also added to a candidate's total score. (*Id*.) The candidates are then ranked on the "eligible list" according to their overall score. (*Id*. ¶ 9.) The MPD then selects a certain number of candidates on the eligible list to proceed to the background investigation phase.[2] (*Id*. at ¶ 10.)

---

[2] Background investigations are required under Minnesota law. *See* Minn. Stat. § 626.87.

(Footnote Continued on Next Page)

The MPD background investigation is roughly a twelve-week process. The candidates first complete a sixty-plus page background questionnaire. (Aff. of Kara Peterson ("Peterson Aff.") ¶ 3.) After the questionnaire is completed, a background investigator is randomly assigned to each candidate. (*Id.* ¶ 4.) The investigator reviews the questionnaire, runs database checks, and sends out requests for information and inquiries to references, educational institutions, and former employers. (*Id.*) After reviewing the relevant information, the investigator conducts a background interview of the candidate. (*Id.* ¶ 7.) After the background check is complete, the background investigator prepares a summary of the background investigation. (*Id.* ¶ 8.) This summary does not contain the candidate's name, age, gender, race, ethnicity, or national origin. (*Id.* ¶ 8.) Instead, the candidates are assigned a number used for identification.

After the background investigations are complete, an MPD "hiring board" (or roundtable panel) meets to discuss the results of the background checks of all the candidates. (*Id.* ¶ 9.) Prior to this meeting, members of the roundtable are provided the summary reports for each candidate. (*Id.*) The roundtable discusses each candidate by number and each candidate is given a recommendation of either "select," "non-select," or "select with reservations." (*Id.*) The roundtable panel sends a full candidate tally sheet, along with background summaries showing the candidates' names and tally numbers, to the police chief or designated final decision maker. (Champa Aff. ¶ 13.) In this case,

---

(Footnote Continued From Previous Page)

Assistant Chief Sharon Lubinski was the designated final decision maker. (Lathrop Aff. ¶ 5, Ex. 4 (Dep. of Sharon Lubinski ("Lubinski Dep.")) at 8; Gerlicher Dep. at 18.) Deputy Chief Scott Gerlicher was also involved in the decision, but the extent of his involvement is unclear in the record. (Champa Aff. ¶ 28.)

The MPD determines how many open police recruit positions it will fill. (Champa Aff. ¶ 13.) Using the tally list, the final decision maker determines which candidates will receive conditional job offers based on the number of open positions. The MPD applies the "Rule of 3," which means, for example, if the MPD was going to hire one police recruit, human resources would certify a list of the top three candidates and the final decision maker would chose one of the three to make an offer. (Champa Aff. ¶ 13.) If a candidate is given a conditional job offer, he or she must then undergo pre-employment physical and mental examinations. (Champa Aff. ¶15.) If the candidate passes these examinations, a final job offer is extended. (*Id.*)

In May 2006,[3] the MPD posted a job for MPD police officer recruits. City of Minneapolis Human Resource Associate Kathleen McDonald sent Amini an application and inquired into whether he was still interested in becoming a MPD police officer. (Champa Aff. ¶ 18.) Amini submitted an application on May 12, 2006. Amini was given 86 out of 100 points for his training and experience and was selected for further testing. (*Id.* ¶ 19, Ex. 7.) Amini passed the physical examination and was given 85 out of 100

---

[3] In his opposition papers, Amini points to evidence of his efforts to apply to the MPD dating back to 1996. However, it is the 2006 application process that is the subject
(Footnote Continued on Next Page)

5

points on the oral examination. (*Id.* ¶ 11.) Amini's combined score for the physical and oral examinations totaled 83.98. (*Id.* ¶ 22, Ex. 10.) This score was the 63rd best score out of 83 eligible candidates. (*Id.*)

Officer Amy Caspers conducted Amini's background investigation. Amini received a background questionnaire in which he answered "no" to the questions "Were you ever named as a suspect, arrested or listed as an arrested person in a police report?" and "Were you ever subjected to disciplinary action in connection with any employment?" (Peterson Aff. ¶ 15, Ex. 4 at 42, 52.) The background investigation, however, revealed that Amini had been subjected to discipline during his employment with Wackenhut Security and that Amini was listed as a suspect in a fifth degree assault complaint in 1994. (Peterson Aff. ¶¶ 21, 22, Exs. 6, 7, 8.) Specifically, Officer Caspers' review of Amini's personnel file from Wackenhut Security revealed two disciplinary actions. First, in February 2004, Amini was written up for being out of uniform, and in March 2004, Amini was written up for failing to complete his patrol, doing his patrol too quickly, and entering the client's parking lot too early. (*Id.* ¶ 22, Ex. 8.) In addition, Officer Caspers discovered that Amini was listed as a suspect in a fifth-degree assault complaint in a 1994 police report. (*Id.* ¶ 21, Ex. 6.) The public data from that report read in part:

> Victim and suspects had an argument over a parking space on the street.
> Victim parked his car and the suspects became mad and called the victim

---

(Footnote Continued From Previous Page)
of this lawsuit.

names and pulled his hair. Victim was able to obtain suspect #1's license
plate number. Victim worked with security personnel in gathering suspect
info.

(*Id.* ¶ 21, Ex. 6.)

Officer Caspers conducted Amini's background investigation interview with Officer Kara Peterson present. At the beginning of the interview, Officer Caspers told Amini that if he forgot to document something in his application that he could give them the information during the interview. (*Id.* ¶ 25, Ex. 11 at 1:05-1:10.) Officer Caspers asked if there was anything Amini forgot to document and Amini answered "no." (*Id.* at 1:20-1:24.) During the interview, Officer Caspers asked Amini whether he ever had any verbal or written reprimands or disciplinary action in connection with any former employment. (*Id.* at 7:45.) Amini answered "no." (*Id.*) Officer Caspers indicated that two written reprimands were in Wackenhut Security's file on Amini and asked Amini about them. (*Id.* at 7:50.) Amini initially indicated that he did not remember the reprimands, but later stated that he remembered the incidents but did not believe he had received a written reprimand. Office Caspers also presented Amini with the police report indicating that he was a suspect in a fifth-degree assault in connection with an argument over a parking space. Amini claimed that he was not involved and that it was his brother who had an argument, but Amini did state that he was present during the incident. (*Id.* at 17.00-21:40.)

Near the end of the interview, Officer Caspers asked Amini if he wanted to clarify or explain anything. Amini indicated that he wanted to talk more about the police report

7

and on-the-job reprimands. (*Id*. at 28:40.) After some discussion, Amini stated: "I was reprimanded, so what's the big deal?" (*Id*. at 30:07.) Officer Caspers and Amini then engaged in the following exchange:

> Officer Caspers: I understand that you're mad at [Wackenhut Security] that you have these reprimands in your file, but don't get defensive and don't say it's not a big deal. Because this is your final step to get where you want to go with the police department . . . .
>
> Amini: I wouldn't hide it.
>
> Office Caspers: I'm not saying you would hide it. But it is a big deal to us the way you are reacting. And the way you are reacting to this is kind of a big deal. . . .

(*Id*. at 30:45.) In her deposition, Officer Caspers testified that Amini reacted to her questions regarding the Wackenhut Security file by arguing, becoming frustrated, and demanding that the items be removed from his background investigation. (Caspers Dep. at 41-44.) Officer Caspers also indicated that Amini's reaction to the information was inappropriate and one that she had not seen from any other candidate. (*Id*.) Similarly, Officer Peterson testified that Amini "was tripped up over some very minor details . . . and [that in her opinion] it wasn't the best behavior for a job interview." (Peterson Dep. at 24, 25.) After the background interview, Officer Caspers drafted her background summary report for review by the roundtable panel. (Peterson Aff. 20, Ex. 5.) The document did not reflect Amini's name, color, or national origin—although it did indicate that the candidate attended high school in Kabul, Afghanistan. The investigation summary noted, among other things, that Amini had been asked to resign from a job

working as a bill collector because he made a debtor cry and used derogatory language during a collection phone call. (*Id*. at 7.) In addition, the summary covered the 1994 police report listing Amini as a suspect in an assault complaint and Amini's employment history. In the summary, Officer Caspers also explained that:

> In the candidate's background interview, the candidate became very defensive, agitated, and argumentative when presented with the documentation regarding the above written reprimands. The candidate stated he/she was not aware of either of these issues. The candidate indicated he/she had reviewed his/her file last year and stated neither of these reprimands were in his/her file. The candidate stated he/she wondered if the file presented for this investigation was actually his/her complete personnel file, or different file kept by the company.

(*Id*. at 6.)

The roundtable's tally sheet, along with the panel's recommendations and the full background summaries on the candidates, were given to Assistant Chief Lubinski. (Lathrop Aff. ¶ 5, Ex. 4 at 7-10.) The MPD intended to hire ten police recruits and therefore sent police administration the top twelve names from the eligible list, ten of whom received a recommendation of "select." (Champa Aff. ¶ 27, Ex. 12.) Amini was on the list of twelve, but received a recommendation of "non-select." (*Id*.)

During her deposition, Assistant Chief Lubinski explained why Amini did not receive a job offer:

> There were really two things [in Amini's background investigation summary]. One that stood out was the fact, according to the backgrounds investigator, that when he was shown documentation about two written reprimands from his or her former employment with Wackenhut and the police report regarding the Assault 5, which is a misdemeanor assault in Minnesota law, the candidate became very defensive, agitated, and argumentative, the candidate wanted these items removed from his/her

9

background investigation since he or she stated he did not know about the reprimands and called the police report absurd.

  That stood out in particular in the sense that a candidate for a job, and particularly a candidate for a police job, to become agitated during a background interview doesn't bode well for how that person is probably going to be able to withstand verbal criticism when answering 911 calls.

  And the second thing that stood out for me was [sic] appeared to be a pattern of poor temperament in terms of the candidate resigned in lieu of termination from a job because he apparently made someone he was working with in that job cry and made derogatory comments. There was a dispute over an altercation over a parking space where he became a suspect in the report. So to me there is a pattern here in terms of an inability to control one's emotions in order to constructively resolve a situation.

(Lubinski Dep. at 41-43.) Assistant Chief Lubinski also testified that a candidate's temperament is very important for a police recruit:

  An officer, on a daily basis, needs to be able to work with people in all kinds of situations. And we often encounter people through our work for people who are having probably their worst moment of their life, whether they're being arrested or they're a crime victim or – and also dealing with people from many different cultures.

  And policing is a contentious business by its very nature. Arresting somebody can be very contentious. So the ability to have an even temperament and cool under pressure is really critical both in terms of, you know, getting through that situation safely, arresting someone, and keeping, you know, the officer safe and keeping the citizen safe.

(*Id.* at 23.)

On February 24, 2009, Amini brought this action against the City, alleging violations of Title VII and 42 U.S.C. § 1981.

## DISCUSSION

**I. Legal Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Title VII

Amini alleges that the City discriminated against him on the basis of his national origin, race, and color in violation of Title VII. The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),

11

applies to the determination of whether the City is entitled to summary judgment on Amini's claims. Under the *McDonnell Douglas* framework, if a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer is able to articulate such a reason, the burden then shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804-05.

In order to establish a *prima facie* case of disparate treatment for Title VII purposes, Amini must demonstrate (1) that he was a member of a protected group; (2) that he was qualified for the position sought; (3) that he suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 475-76 (8th Cir. 2005); *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850-51 (8th Cir. 2005). The fourth element can be met by demonstrating that similarly-situated employees of a different color, race, or national origin were treated differently. *Rodgers*, 417 F.3d at 850-51.

There is no dispute that Amini is a member of a protected class and that the City's decision not to offer him a conditional job offer was an adverse employment action. Therefore, with respect to his *prima facie* case, the Court addresses whether Amini was qualified and whether circumstances exist which create an inference of discrimination.

Amini asserts that he was qualified for the position of a police recruit because he had a college education, spoke five languages, was P.O.S.T. certified, and ranked second among the final twelve candidates. The City, however, asserts that Amini cannot establish that he was qualified because the City's interview with him and his own background led the City to conclude that his temperament was not suited for the position. In support, the City points to Amini's background interview, his resignation from a debt collection job for making derogatory comments, and the fact that he was a suspect in a police report for arguing over a parking space. The Court concludes that viewing the record in the light most favorable to Amini, a reasonable juror could conclude that Amini was at least minimally qualified for the position.

Amini also asserts that he can establish the fourth element of his *prima facie* case with the same evidence used to show pretext. The City claims that it chose not to offer Amini a job as a police recruit because it had serious concerns about Amini's temperament given that he became agitated, defensive, and argumentative during his interview. The Court concludes that the City has offered a legitimate, non-discriminatory reason for failing to offer Amini a conditional job offer as a police recruit. Therefore, the Court considers the fourth element of the *prima facie* case and evidence of pretext together.[4] Amini asserts that a plaintiff may show pretext with evidence that an

---

4   Because the City has proffered a legitimate, non-discriminatory reason for not hiring Amini, any presumption of discrimination disappears, and Amini can avoid summary judgment only if the evidence demonstrates that the City's proffered reasons are
(Footnote Continued on Next Page)

employer's proffered reason is unworthy of credence *or* with evidence that a prohibited reason likely motivated the employer. This, however, is not the standard. To avoid summary judgment after the City has proffered a legitimate, non-discriminatory reason, Amini must present evidence sufficient to create a material issue of fact as to whether the City's reasons are pretextual *and* to permit a reasonable inference that the real reason Amini did not receive a job offer was based on discrimination. *See Johnson*, 422 F.3d at 763 ("We have recognized that the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee . . . . [A plaintiff] is also required to show that circumstances permit a reasonable inference to be drawn that the real reason [for termination] was because of [] race.").

Amini asserts that a reasonable juror could infer that the City's reasons for not hiring Amini are a pretext for discrimination based on Caspers' subjective description of Amini's oral interview as "defensive, agitated, and argumentative" and Assistant Chief Lubinski's final decision not to hire Amini. In addition, Amini argues that there is evidence of indirect discrimination and points to the subjective nature of the hiring process, the use of different standards and questions by investigators in interviews and background investigations, the omission of detrimental information from reports on

---

(Footnote Continued From Previous Page)
a pretext for discrimination. *See Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).

Caucasian candidates, the hiring of Caucasian candidates with similar or lower qualifications, and the absence of criteria used by the roundtable panel.

The test to determine if one is "similarly situated" is different at each stage of the *McDonnell Douglas* analysis. *Wheeler*, 360 F.3d at 857. The standard for determining whether employees are similarly situated at the *prima facie* stage is a "low threshold," requiring only that the employees are involved in or accused of the same or similar conduct and are treated in different ways. *See, e.g., Rodgers*, 417 F.3d at 852 (quoting *Wheeler*, 360 F.3d at 857). At the pretext stage of the *McDonnell Douglas* analysis, the test to determine whether employees are "similarly situated" is "rigorous." *Wheeler*, 360 F.3d at 858. The employees must have been "similarly situated in all relevant respects." *Id*. (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988)).

Here, Amini asserts that certain Caucasian candidates were treated differently and more favorably than him during the hiring process. In particular, Amini asserts that the Caucasian candidates who were ultimately hired did not have greater qualifications. For example, Amini stresses that he had a college degree and spoke five languages, while certain Caucasians did not. In addition, Amini asserts that Caspers' characterization of his interview as "defensive" and "argumentative" worked against him, while other Caucasian candidates demonstrated issues with temper and aggression without a negative effect on their applications. In addition, Amini asserts that the conclusions in the background reports of Caucasian candidates lacked detrimental information.

The Court concludes that Amini's evidence of alleged favorable treatment of similarly situated candidates fails to demonstrate pretext or to permit an inference of discrimination at the *prima facie* phase. Amini's argument of discriminatory treatment in comparison to Caucasian candidates centers on the allegation that Officer Caspers' analysis of Amini's background was biased and that this biased analysis was relied upon and negatively impacted his application.[5] However, Officer Caspers did not conduct any of the investigations for the Caucasian candidates upon which Amini relies. Instead, the record is undisputed that other officers conducted their background investigations. Because Amini's claim of discrimination centers on the allegedly biased investigation by Officer Caspers, the fact that none of the candidates Amini uses as comparators were investigated by Officer Caspers precludes the candidates from being considered "similarly situated" for purposes of a discrimination analysis at either the *prima facie* or pretext stage. Amini has simply not pointed to any evidence in the record that could lead a reasonable juror to conclude that Officer Caspers treated any similarly situated Caucasian candidates more favorably than Amini or that she otherwise discriminated against Amini based on his race, color, or national origin.[6]

---

[5] Amini claims that the City cannot shield itself from liability by using a purportedly independent person (Assistant Chief Lubinski) as a vehicle by which another (Officer Caspers) achieves the unlawful goal of preventing Amini's hire because of his national origin.

[6] Amini also argues that Caucasian candidates failed to disclose significant information but were offered jobs. However, the record establishes that it was not simply Amini's failure to disclose information, but rather his reaction when asked about the

(Footnote Continued on Next Page)

16

Amini also argues that the subjective nature of the investigations and background summaries is suspect and an indication that the summaries and investigations were a pretext for discrimination. Specifically, Amini asserts that the City's reasons for not hiring him were subjective and premised on Officer Caspers' description of Amini's interview responses as "defensive, agitated, and argumentative." Amini argues that the hiring process involved many subjective components that demonstrate indirect discrimination.

The record establishes that the City did have objective criteria in place with respect to the hiring of police recruits. Moreover, that there are also subjective components to the hiring process does not automatically demonstrate that the decisions made with respect to Amini were discriminatory. Here, Amini has not pointed to record evidence that casts doubt on the justifications offered by the City and therefore any subjective elements in the hiring process do not give rise to an inference of discrimination. *See, e.g.*, *Chambers v. Metro. Prop. and Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003) ("The use of this subjective consideration in this case does not give rise to an inference of discrimination because the plaintiff was unable to cast doubt on the justifications offered by the employer.").

Amini also attempts to demonstrate pretext with evidence that the City failed to follow its own policies. Specifically, Amini asserts that to the extent that he was not

---

(Footnote Continued From Previous Page)
undisclosed information, that drove the City's decision not to offer him a job.

hired for failing to disclose information on his background questionnaire, the City's failure to make the same decisions when Caucasian candidates failed to disclose information demonstrates pretext. In addition, Amini asserts that the City has a policy that requires that background investigation summaries be provided to the roundtable members at least five days prior to the meeting and that was not done here. This evidence, however, is insufficient to demonstrate pretext. First, the record establishes that the City's proffered reason for failing to hire Amini was because of the City's concerns about Amini's temperament. Second, the record establishes that the City's five-day rule did not come into effect until after Amini's application was considered by the roundtable. (Fiebiger Aff. ¶ 2, Ex. DD (Dep. of Mark Koenig ("Koenig Dep.")) at 43.)

Finally, Amini asserts that the City's alleged legitimate business reasons for not hiring him have changed substantially over time. Specifically, Amini asserts that the reason the City gave to the EEOC has changed. Amini argues that this change in reasons could lead a jury to find that the City's proffered reason is a pretext for discrimination. In its response to Amini's EEOC discrimination charge, the City explained that the investigation into Amini's background revealed that Amini was not hired because he failed to disclose that he was a suspect in an assault complaint, he failed to disclose that he had a gun permit, he received two written warnings from his current employer, and that in 1999 he resigned from a job instead of being involuntarily terminated. (Fiebiger Aff. ¶ 2, Ex. 44 at 8.) The City's response further explains:

> Regarding Mr. Amini's demeanor, the investigators noted, '[t]he candidate became very defensive, agitated, and argumentative when presented with

18

> the documentation regarding the [Assault 5] police report.' Mr. Amini's demeanor in response to the investigators' reasonable inquiry is inconsistent with the expected temperament for a peace officer and influenced the MPD's decision to not offer him employment.

(*Id.* at 9.) The City asserts in its memorandum in support of its motion for summary judgment that Amini was not hired because the City had concerns about whether Amini's temperament was well-suited to police work, given that Amini became agitated, defensive, and argumentative when confronted with the reports of disciplinary actions in his employment during his interview. This reason is not different from the reasons stated in the City's EEOC response. If anything, the City has elaborated on its original reasons. *Cf. Rodgers*, 417 F.3d at 855 (explaining that although substantial changes over time in the employer's proffered reason for termination support a finding of pretext, this does not mean an employer cannot elaborate on its reason). Thus, Amini has failed to demonstrate that the City shifted its position so as to raise a material fact as to pretext or to permit a reasonable inference of discrimination.

The Court notes that Title VII prohibits intentional discrimination based on certain classifications. It does not prohibit employment decisions based on other legitimate factors, "such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." *Rose-Matson v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998). Here, Amini has failed to cast doubt on the City's legitimate reason for failing to offer him employment with the MPD or to point to any evidence that the decision was based on discriminatory motives. Accordingly, the Court grants the City's motion for summary judgment as to Amini's Title VII claim.

## III. Section 1981

Amini also asserts that the City violated 42 U.S.C. § 1981 by intentionally discriminating against him based on his national origin, race, and color. To establish a *prima facie* case of discrimination under § 1981, a plaintiff must demonstrate that he is a member of a protected class, that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a protected activity. *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Section 1981 further provides that all persons shall have the same right to "make and enforce contracts" including the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (a)-(b). The elements of a Title VII disparate treatment claim and a claim under § 1981 are the same and both use the *McDonnell Douglas* framework. *See Kim v. Nash Finch*, 123 F.3d 1046, 1056 (8th Cir. 1997). As explained above, Amini's Title VII claim fails. Thus, Amini's § 1981 claim fails as well.

## CONCLUSION

For the reasons stated, **IT IS HEREBY ORDERED** that:

1. The City's Motion for Summary Judgment (Doc. No. [13]) is **GRANTED** in its entirety.

2. Amini's Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: July 28, 2010                     s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge